## HOLT et al. v. INDUSTRIAL COMMISSION OF UTAH et al. (two cases).

Nos. 5988, 6037.    Decided February 27, 1939.    (87 P. 2d 686.)

*Joseph S. Nelson,* of Salt Lake City, for plaintiffs.

*Joseph Chez,* Atty. Gen., and *Harry D. Pugsley* and *Herbert B. Maw,* both of Salt Lake City, for defendants.

McDONOUGH, Justice.

Certiorari to the Industrial Commission to review in each case an award of compensation. Florence R. Crane, to whom an award was made in the first case, is the mother of Joseph Dale Crane, deceased, who was killed July 5, 1937, when a truck loaded with fruit and produce which he was driving ran off the road and was wrecked. In the same accident, Harold E. French, awarded compensation by the Commission in the second case, was injured.

The plaintiffs do not question the finding of the commission to the effect that the accident causing such death and injury happened in the course of the employment in which Crane and French were engaged, nor is complaint made as to the amount of the award. While some contention is made in plaintiffs' briefs that the purported employees were independent contractors of S. J. Holt and S. E. Holt, doing business as the S. J. Holt Company, and also that the employment, whatever its nature, was not "regular" employment, the evidence on such issues clearly establishes that the relationship between S. J. Holt and S. E. Holt, on the one hand, and Crane and French, on the other, was that of employer and employee; and that the latter were regularly employed, though, as indicated hereinafter in the discussion of the evidence relative to casual employees, the latter fact is not material.

Plaintiffs, however, contend that, conceding the two workers mentioned to be regular employees of the S. J. Holt Company, the evidence before the Commission does not establish that at the time of the accident the plaintiffs, or any of them, had "three or more workmen or operatives regularly employed in the same business, or in or about the same establishment, under any contract of hire," Secs. 42-1-40 and 42-1-41, Rev. Statutes Utah 1933, and hence that the Commission acted in excess of its power in making the award.

This presents a question which has been denominated one of jurisdiction under the consistent rulings of this court.

*Industrial Comm.* v. *Evans,* 52 Utah 394, 174 P. 825; *Hardman* v. *Industrial Comm.,* 60 Utah 203, 207 P. 460; *Angel* v. *Industrial Comm.,* 64 Utah 105, 228 P. 509. It becomes our duty, therefore, to determine the facts from a preponderance of the evidence and apply thereto the law of the case. *Angel* v. *Industrial Comm.,* supra; or as stated by way of dictum in the case of *Norris* v. *Industrial Comm.,* 90 Utah 256, 61 P. 2d 413, 415, as to findings by the Commission on jurisdictional facts:

"On these this court examines the evidence to see whether it clearly preponderates against the conclusion of the commission."

Whether the evidence before the Commission preponderates against its finding to the effect that the three plaintiffs, S. J. Holt, S. E. Holt, and Prudence W. Holt, had in their employ on and before July 5, 1937, three or more employees and whether it preponderates against such finding as it applies to the first two named of the plaintiffs, excluding Prudence W. Holt, is the question presented for review.

The "finding" of the Commission on the issue stated is thus worded:

"On or before the 5th day of July 1937 the defendants S. J. Holt, S. E. Holt and Mrs. Prudence W. Holt were jointly operating and doing business as a copartnership known as the S. J. Holt Company importing and selling produce under the name 'Holt Produce Co.'; also doing a retail business known as the 'Square Deal Store' at 1563 So. Main Street Salt Lake City. That the said defendants were operating and doing business jointly and on said date, had in their employ three or more employees and were subject to the State Industrial Act."

The following facts are established by evidence which is uncontradicted and, indeed, about which there is no dispute: Plaintiffs, S. J. Holt and S. E. Holt are father and son, and plaintiff, Prudence W. Holt, is the wife of S. J. Holt and the mother of S. E. Holt. The father and mother resided at the time of the accident, and for some time prior thereto, at 1563 South Main Street, Salt Lake City; while the son

resided with his wife in a home several blocks from the residence of his parents. Title to the property at 1563 South Main Street was in Prudence W. Holt. The front part of the building was a store room devoted to the business of the Square Deal Grocery, while the rest was used, as recited above, as the residence of the father and mother. In addition to this property the mother owned another piece of real estate which she rented.

At a time prior to a year or so before the accident S. J. Holt had engaged in the business of trucker and produce dealer, and S. E. Holt had been a dealer in produce, each carrying on his business independently of the other. About a year prior to July 5, 1937, owing to financial difficulties of the father, they merged their resources, S. J. Holt contributing the trucks and his son the requisite capital with which to do business. They agreed (so the father and son testified) to divide the proceeds of the enterprise equally.

The father and son thus operated for a year or so prior to the accident as a partnership. The business consisted in purchasing citrus fruit and other seasonal produce from neighboring states, principally from California, and trucking it to Salt Lake City where they sold it. The business had a rented open stall on the Growers Wholesale Market at Salt Lake City and also had, jointly with one J. A. Hart, incidental warehouse privileges under a written lease from the said market, the lease running to S. J. Holt, S. E. Holt and J. A. Hart. S. E. Holt engaged and directed the truck drivers and their buying and unloading while S. J. was engaged daily at the market disposing of the produce.

So much is not in dispute, except that the applicants before the Commission contend that Prudence W. Holt was jointly interested with her husband and son in the described business. Nor is it in dispute that such business had terminal and storage facilities at the property at 1563 South Main Street—the residence and store. The portion of this property devoted to the business of the Square Deal Grocery was used principally, in so far as space is concerned, for storing

citrus fruits hauled in on the truck. A loaded truck arriving in Salt Lake City would go to the Growers Market where most of its produce, other than citrus fruit, would be unloaded. The rest of the load consisting of little else than citrus fruit was taken to the store at 1563 Main Street. It was there stored and was sorted and put in boxes. One half of all the imported citrus fruit was so packed at the store. Some of the crated fruit was displayed in front of the store and offered for sale to retail trade. Most of it, however, was later taken to the market and there sold at wholesale. The Square Deal Grocery also retailed, though in very small quantities, some stock other than citrus fruit. It received and disposed of a few loaves of bread and a few bottles of milk daily, and had on its shelves and for sale a very small quantity of canned goods. The store dealt almost wholly in citrus fruit, the mass display of which, packed in boxes in front of the store, being the customer-enticing feature of this retail business. The name "Square Deal Grocery" was inherited from previous occupants of the premises who had rented from Prudence W. Holt.

For some months prior to the accident French and Crane had been employed in driving a truck to California and there purchasing produce and hauling it back to Salt Lake City where it was unloaded and disposed of as stated. When they were paid, they received their money from S. E. or S. J. Holt. The former directed them as to the purchase of fruit and no instructions were ever given them, except as hereinafter noted, by Prudence W. Holt. The actual hiring of the boys was done by S. E. Holt.

Employed at the Main Street store was one regular employee, named Bringhurst. He, with Mrs. Holt, waited on customers and kept the place in order. Taking up most of his time, however, was the business of sorting the citrus fruit and packing it in boxes. When the loaded truck would come to the store, Bringhurst would assist the drivers in unloading it. On occasions in the evening when the trucks would be loaded at the store with boxed fruit to be taken

to the market on the following morning, he would load it. When a truck would come in late, he would go up to the market and assist in unloading it, and "once in a while" he went to the market and helped pack fruit there. On rare occasions he would make a wholesale delivery—that is, delivery of a case or two of fruit for S. E. Holt, though it was not, he testified, a part of his regular duties. Occasionally, too, while helping unload at the market he made a sale—though when he did so, he did not know whether S. E. Holt or S. J. Holt knew of it since purchasers paid S. J. Holt. Mrs. Prudence W. Holt hired him and always paid him his wages and gave him his instructions at the store. She always took the money from the till at the end of a day's business. No books were kept at the store to show how much of the fruit was sold there, but Mrs. Holt and Bringhurst both testified that the number of oranges sold at the store could be determined by counting the number left in a box from which sales had been made, since after sorting, they knew how many a box would hold, and Mrs. Holt and S. E. Holt both testified that she paid S. E. Holt and S. J. Holt for the number thus disposed of.

All of the plaintiffs testified that the storage facilities at the store were rented to the father and son by the mother at a rental of $10 per month, which was regularly paid, though no receipt was made out and given the former by the latter. Mrs. Holt testified that in addition to the $10 rental she received the advantage of having the fruit when packed in boxes to use as a mass display and thus attract customers. She also testified that some of the property which she owns is not fully paid for and she tried to meet the payments out of her independent income. The merchandising license for the store was in her name.

The plaintiffs all testified that the business of hauling fruit and the disposal thereof at the Growers Market was the business of S. J. Holt and S. E. Holt in which Prudence W. Holt had no interest and that the Square Deal Grocery was owned and operated solely by Mrs. Holt. The father

and son testified that they divided the profits from their business equally, and there is testimony from several relatives and friends that, they had seen such division made at the home of one or the other of the Holts. S. E. Holt spent some time at the store helping pack oranges and on a few occasions waited on a customer when his mother and Bringhurst were busy.

The only semblance of instructions which Mrs. Holt ever gave Crane and French relative to their work was the admonition to be careful while driving and to watch the produce they bought—to "get good fruit."

Bringhurst had been employed at the store from about the middle of January 1937 until just after the date of the accident. He succeeded an employee named Garrett, who at the hearing testified that he had worked at the store for about a month previous to the employment of Bringhurst and that Bringhurst, who prior thereto had made a couple of trips on the truck for S. E. Holt, came down to the store to see Mrs. Holt about securing Garrett's place when the latter left, and that Bringhurst was thereafter employed. Garrett's testimony reveals that he did substantially the same work at the store during his month of employment as Bringhurst did thereafter, except that he did not ever go to the market, nor did he testify that he ever made any deliveries. He took all of his instructions from Mrs. Holt. At the time he worked there, they had a "good sized" stock of groceries at the store.

The day after the accident S. E. Holt took Bringhurst with him to the scene thereof to assist in looking after the truck and produce and a few days later, Holt paid Bringhurst and told him Mrs. Holt would not need him any longer. Mrs. Holt testified that she, being ill as a result of the accident, instructed her son so to do. Bringhurst thereafter went to see Mrs. Holt about his employment being discontinued. Following the accident the trucking and wholesale fruit business was discontinued as was that carried on at the store.

Such is the substance of the testimony relating to Bring-hurst, Crane and French being in the joint employment of the plaintiffs. Before discussing its sufficiency to establish such fact, it is necessary to briefly advert to a contention of defendants to the effect that even eliminating the employment of Bringhurst, the evidence discloses that during the period of time which includes the date of the accident there were three or more employees engaged in the business of the Holts; or at least of that of the father and son. The testimony which it is claimed supports this conclusion is that relative to others than the three mentioned who, during such period, did work in unloading the trucks either at the store or the market. It would serve no purpose to recite the details of such testimony. It but reveals that on occasions a boy or young man was hired to help unload the truck. This was not the usual practice, such services being required infrequently. However, its frequency is not important in the instant case. The pertinent fact here is that on the day of the accident none of such casual employees were in the employ of any of the plaintiffs. The term "regularly employed" as used in Secs. 42-1-40 and 42-1-41 of the Industrial Act has been construed by this court to include all employees who are employed and engaged in the "usual or regular business of the employer, regardless of whether they were regularly or only casually or occasionally employed, so long as they on the day and the time of the accident were employed and engaged in the usual or regular business of the employer." *Palle* v. *Industrial Comm.*, 79 Utah 47, 7 P. 2d 284, 290, 81 A. L. R. 1222. Had there existed at the time of the accident the relation of employer and employee between the plaintiffs, or some of them, and one or more of such casual employees, then the employers who had in their service two additional regular employees would, under the construction given the term in question, come within the provisions of the Act. But the fact that at some time prior to the date of an industrial accident an employer, having at such time less than three

employees, had in his employ one or more casual employees would not make him, at the time of such accident, subject to the Act.

Under the undisputed evidence in this case the helpers were casual employees whose employment was in the usual course of the business of the employers, but not being employees on the date in question, they may be eliminated in determining whether on such date there were three or more employees in the service of plaintiffs.

This must be determined, then, from the evidence respecting the relation between French and Crane and the three plaintiffs and the evidence having reference to the relation between the plaintiffs and Bringhurst. That S. J. Holt and S. E. Holt were partners and that they, as such partners, engaged and paid the remuneration of Crane and French, is admitted by the plaintiffs. Whether Prudence W. Holt was an employer of the two truck drivers mentioned must be resolved by a determination of whether the evidence establishes either (1) a partnership between the three plaintiffs or (2) a joint hiring of the two in question by the father and son in their business and by the mother in her business. Plaintiffs likewise admit that Bringhurst was an employee of Prudence W. Holt. Whether he was an employee also of S. J. and S. E. Holt depends likewise upon proposition one or two above.

Except the bare fact that some of the services rendered by the employees were of benefit to the three plaintiffs, there is nothing in the evidence which would support a finding that the Square Deal Grocery and the wholesale business as separate enterprises hired the services of the three alleged employees. That Crane, French, and Bringhurst were servants of the three plaintiffs must depend upon there being a joint interest and operation by the latter of the business conducted at the market and that carried on at the store. The Commission concluded that there was a partnership which engaged in both businesses. This conclusion could only be arrived at by inferring it from the evi-

dence relative to the manner in which the businesses were conducted—an inference which would be directly contrary to the testimony of the plaintiffs the only parties who testified or who knew as to what was the actual business arrangement among them. Their testimony was not directly contradicted.

Disregarding, for the moment, such testimony of the plaintiffs, we proceed to examine the rest of the evidence to determine what inferences may be logically and reasonably deduced therefrom.

There is the fact that S. J. Holt and Prudence W. Holt are husband and wife, residing at one of the places of business, which business, ostensibly conducted by the wife, dealt in the same produce as the other business in which the husband was engaged. From this fact alone, perhaps no inference either as to joint or separate operation of and interest in the two business may be inferred. However, it is probably more in accord with experience that the inference of joint interest and operation is the more reasonable. But add to this fact several others, to wit: that the wife had title to the property where the one business was conducted and where she and her husband lived; that such property had been in her name for some ten years, and that she owned other real estate separately; plus the further fact that during a time while she and her husband were engaged in the business or businesses in question, she had contemplated divorce; and the inference of joint operation becomes no more reasonable than that of independent operation.

Next, there is the evidence relative to the work of Bringhurst, the employee at the store. It is evident that his packing of oranges in boxes, as well as his assistance in unloading the truck at the store as a preliminary thereto, was of direct benefit to both the wholesale and retail businesses. This, without more, would give rise to an inference that he was an employee in both businesses, or departments, and would support the theory of joint ownership and operation. Yet when another fact is considered, to wit: that the pack-

ing of the oranges in boxes and the making thereof of a mass display was of primary importance in the conduct of the retail business or department, and that it was advisable for that purpose to pack more boxes than could be used at the store, which boxes were disposed of at the market, the inference of joint operation is not so readily drawn.

When the relationship of father, mother, and son is again considered in connection with this employment of Bringhurst, the fact that he was on occasion employed in a delivery for the market business is consistent with the hypothesis that the businesses were severally owned and operated. That the mother might permit her servant to render such service for a son and father is not unreasonable. So, also, as to his work in unloading the truck at the market and of spending some time there in packing oranges. This alone points to a joint business. When it is remembered however, that it was only on the occasions when the truck came in late and it was for that reason inferentially more convenient to unload and pack the oranges at the market, the inference of separate ownership and operation appears not unreasonable.

It is doubted that, even disregarding the testimony of the plaintiffs which related directly to such arrangement, the record establishes a partnership among the three plaintiffs; or any such joint interest in and operation of the two businesses as would make the ostensible employee of the one business the employee also of the other. Should Bringhurst have brought an action against the father and son to recover his wages for work at the store, it is doubted that a verdict in his favor based on such evidence would be permitted to stand. So, likewise, as to a similar verdict in favor of Crane and French as against the mother.

It is necessary, obviously, to discredit the testimony of each of the plaintiffs relative to their respective interest in the businesses in order to reach a conclusion of joint ownership. Their testimony is a categorical denial of such joint

interest and an explicit assertion of independent sole
ownership in Prudence W. Holt of the grocery store ■
and in the husband and son of the market enterprise.

They are, it is true, parties to this proceeding directly in-
terested in its outcome. This fact must be taken into con-
sideration in determining whether any weight should be
given their testimony as to the ultimate fact in controversy.
Yet, as indicated, their testimony on this point is not in-
herently improbable. There is no direct contradiction thereof
by any witness. It can reasonably be reconciled with all the
other competent evidence in the case; it is not self-contra-
dictory; there is nothing in the record to impeach plaintiffs'
credibility except their interest. There is no direct evidence
in the record, other than theirs, relative to facts upon
which the determination of the relation vitally depends,
to wit: Whose money paid the wages of men; what division
of the profits of the business or businesses was made, or who
were entitled to such division? In order to arrive at a con-
clusion that the wages of the three in question were paid
out of the joint resources of the two businesses, the deduc-
tion must be made from the evidentiary facts hereinabove
recited, including that of disinterested witnesses and wit-
nesses adverse to plaintiffs, to the effect that Mrs. Holt
never paid the truck drivers and that the money used to
pay the store help invariably had Mrs. Holt as its immediate
source. A conclusion that Mrs. Holt had a right to a share
in the profits of the market business and that the son and
father were entitled to share in the proceeds of the store
must be reached by reasoning that this must be so since
much of the evidence is not inconsistent with a legal relation
which would be the basis for such right. And it is to deter-
mine whether that legal relation from which such right
would derive actually exists, that we are examining the
record.

We do not believe that such conclusions are any more rea-
sonable than their opposites, nor that the testimony which
suggests them justifies the rejection of the testimony of

the plaintiffs as to their business arrangements. True, the Commission had the witnesses before it and hence were in a better position to judge of their credibility than are we. But there was no conflicting testimony directly relating to the ultimate fact in controversy which would require the Commission to either believe them and reject the testimony of others, or to accept the testimony of others as true and reject theirs as false. Nor is there anything in the record which would indicate that their advantage in having the witnesses before them is such as to cause us to conclude that their finding, otherwise erroneous, must be upheld because of that fact.

It is our judgment that the evidence clearly preponderates against the finding of the Commission on the controverted jurisdictional fact. It follows that the award in each case must be set aside. It is so ordered. Costs to plaintiff.

MOFFAT, C. J., and WOLFE and PRATT, JJ., concur.

LARSON, J., dissents.