## MILLER v. INDUSTRIAL COMMISSION et al.

No. 6002. Decided July 14, 1939. (92 P. 2d 342.)

*A. H. Nebeker,* of Salt Lake City, for plaintiff.

*F. A. Trottier,* of Salt Lake City, for defendants.

McDONOUGH, Justice.

The plaintiff, applicant before the Industrial Commission, is before us on a writ of certiorari to review an order of the Commission denying him recovery of compensation for an injury received by him while working in a sewer trench in Farmington City. The Commission held that at the time of the injury Miller was not employed by Farmington City and denied the application for compensation.

It is the contention of Farmington City and its insurer the State Insurance Fund that at the time of injury Miller was employed by one Robert Griffith, and it is admitted that the injury occurred on the property of Robert Griffith in a lateral trench dug to connect Griffith's store with ■ the sewer. Whether Miller was employed by Farmington City and was therefore entitled to workmen's compensation or was employed by Griffith is a jurisdictional question which we must decide on a preponderance of the evidence. *Weber County-Ogden City Relief Committee* v. *Industrial Commission*, 93 Utah 85, 71 P. 2d 177; *Holt* v. *Industrial Commission*, 96 Utah 484, 87 P. 2d 686.

During the summer of 1936 Farmington City constructed a sewer as a Public Works Administration project, using federal and state money therefor. It was part of the plan to construct laterals onto the property of adjoining owners, to which they could make connection, but the money ran out, and the city could not effect the connections. Permission was given to several property owners to connect with the sewer at their expense pending the obtaining of funds, with a provision for reimbursement by the city. In pursuance of this arrangement Miller dug the trench to the Griffith store and was laying the pipe when the trench caved in on him, breaking his collar bone and crushing his chest severely. Details of the working arrangement are in conflict, and while it must be said that the employment and all arrangements were extremely informal they were quite satisfactory to all concerned and would have given rise to no disputes had not this injury occurred. But when the unforeseen happens the simple, informal arrangements are found not to provide a ready key for determining the intentions of the parties, and lawyers, commissions, and courts must be called in to attempt to reconstruct the bargaining positions and attitudes of the parties in order to determine what effect the forms of law must give to an informal, sketchy working arrangement in order to place liability for an

emergency which was not contemplated or provided for by the parties.

In September, 1936, a petition was circulated in Farmington to enable residents to assent to payment of a $1 per month payment for sewer, the city to run the lateral to the foundation of the houses. A later petition was circulated placing the fee at $1.50 per month without reference to laterals; then a compromise petition fixing the fee at $1.25 was circulated and well received but it likewise made no mention of responsibility for laterals. But the transcript makes plain the understanding of the residents and the city officials that the city was obligated to construct the laterals at least to within five feet of the foundations; and whether the obligation existed is not here material since all parties assumed it to exist. The arrangement to lay the sewer pipe here involved was therefore based on the city's obligation so to do and was brought about by its present inability to pay the labor costs.

Mr. Griffith, however, was troubled by the accumulation of water in the basement under his store and expressed, along with some others, a willingness to pay for labor to make the connection. There is a conflict in the testimony as to whether the city agreed to make reimbursement from funds that would be available, or that it would do so only in the event that it secured the funds. The belief and intention probably was, as indicated by Mr. Griffith and Mayor Sessions, that the city did not promise absolutely to reimburse but did promise to reimburse when the money for such purpose was available. It was an absolute promise to reimburse out of a contingent fund.

The hiring of Miller was done by Griffith and not the city. Miller made the first advance—really an offer to make the connection and Griffith accepted his offer, dependent on word from the city that the pipe would be furnished. Miller's contact at that time with city officials was merely to get the word to go ahead. The true situation is probably indicated by a statement of Mr. Miller on cross-examination:

"Q. Have you an opinion as to who could discharge you from that work? A. I think the city could if I was not doing it according to the specifications they could have Mr. Griffith take me off the job."

Mr. Griffith hired Mr. Miller and was the one who could fire him. The city could discharge him only indirectly by reporting to Mr. Griffith that he was not doing his work according to the standard necessary to insure good operation of the sewer.

Another circumstance adds force to the view that Griffith and not the city did the hiring. Griffith's uncle was employed to assist Miller in laying the pipe and it is uncontroverted that he was hired by Griffith. It is true that the city furnished the pipe, the oakum, tar, and bucket for making joints, and placed the stakes indicating proper grade for the laterals all over the city at the time the main systems were installed. But that is quite consistent with Griffith's being the employer of Miller. A point is also made that the city supervised the installation. The mayor did either suggest or direct that boards be set under the pipe due to the soft base, but this is consistent either with supervision by the city as employer or with the exercise of the right to require proper installation from an engineering standpoint. Since such a requirement was stated by the mayor to Griffith, it was probably made as engineering supervisor rather than employer, although Mr. Miller was also so instructed.

The plaintiff stresses the further point that while the work was in progress the city twice called Miller from his work, once to dig a grave and once to make a water connection, and that Mr. Griffith was not consulted either time. This argument loses its force when it is noted that the City's engineer-manager did not "direct" Miller to do other work, but merely asked him if he were free to do it and each time Miller replied that he was. This was more in the nature of taking a liberty than doing the city employer's bidding.

Plaintiff notes that Griffith gave no instructions whatever as to how Miller should proceed. This does not indicate

so much that Griffith was not the employer and lacked power of control as that he knew nothing about laying sewers, which he admitted. The facts are that Miller was very much a free agent on the job. He kept track of his own time, did his own supervising because he was familiar with the kind of work, and felt perfectly free to work a whole day, a half day, or to do odd jobs for the city between times. He felt free to ignore the advice of the mayor who at one time advised him to use trench jacks or a system of interval tunnelling to prevent cave-ins.

Both sides introduced testimony about the wage Miller was to receive—whether the city fixed it, the P. W. A. scale was followed, or Griffith and Miller agreed on it. Apparently no definite agreement as to the wage was made—it was "just understood" by all parties that the wage would be "the going wage" for that type of work, which was the wage paid by both the city and P. W. A. as all concerned well knew.

The question is whether the city was authorized by Griffith to make the connection, with Griffith supplying funds to pay for the labor, on a promise of contingent reimbursement or whether Griffith secured permission to make the connection, with the city supplying the material and agreeing to make reimbursement for the wages should it later have money for sewer installation. We think the latter was the agreement made by the parties. The only facts which are really colorable are that Griffith did the hiring of both Miller and his helper, and Miller thought the city could fire him only by telling Griffith that the former was not meeting specifications. All the other circumstances are consistent with either the city's or Griffith's being the employer—including the fact that Griffith assumed the risk of not being reimbursed for the labor cost, since he was willing to assume such risk to be rid of the nuisance of accumulated water and his advances could have been merely a financing arrangement to enable the city to do the job.

The plaintiff relies on three Utah cases as supporting his position: *Weber County-Ogden City Relief Committee*

v. *Industrial Commission of Utah,* supra; *Murray* v. *Wasatch Grading Company,* 73 Utah 430, 274 P. 940; *Utah Fire Clay Co.* v. *Industrial Commission,* 86 Utah 1, 40 P. 2d 183. None of these cases is really analogous since in each one different elements of the employment relationship were involved, but taken together they support the view that Griffith was the employer. In the Weber County-Ogden City case the fact that Ogden City supervised the work and directed the employee in all the details of the work was held determinative, but the court discussed the subject fully and said [93 Utah 85, 71 P. 2d 181] "What might be a controlling element in one case may not be controlling in another." The court further indicated that where the question of exercise of control of detail is not proved one way or the other such elements as payment of compensation, power of appointment and dismissal and benefit to be derived from the work must determine the relationship. In the case at bar Griffith knew nothing about sewer placement and so could not give directions as to the manner of work. He did tell Miller to keep track of his time and hired an assistant when needed. The fact that the city required a mechanical precaution to insure satisfactory installation (placing boards under the pipe) was not an exercise of control over the workman so much as it was control over the job which had to meet its ultimate approval. *Murch Bros. Construction Co.* v. *Industrial Commission,* 84 Utah 494, 36 P. 2d 1053; *Gibson* v. *Industrial Commission,* 81 Utah 580, 21 P. 2d 536.

The Weber County-Ogden City case, then, relegates us to other tests which, in the case at bar, indicate that Griffith was the employer.

In *Murray* v. *Wasatch Grading Co.,* supra, a railroad employee was loaned to a construction company doing work on a parallel road such that debris would roll onto and block the railroad track. The employee helped remove the debris and advised the construction company when trains were due so that the track could be cleared and the train flagged if necessary. The construction company was to reimburse

the railroad for the employee's wages, and the question was "whose employee was he?" The court held the employee was in the employ of the construction company because it directed his work and had the duty of keeping the track clear, in which work he was engaged. This case, then, like the Weber County-Ogden City case was decided on elements of the employee relationship which are in doubt in the case at bar and therefore other tests must be resorted to. The other tests were indicated in that case, but it was not necessary to resort to them. They are:

"(1) The selection and employment of the servant; (2) the payment of the servant's wages; (3) the power to discharge the servant."

Likewise in *Utah Fire Clay Co.* v. *Industrial Commission*, supra, the controlling tests were [86 Utah 1, 40 P. 2d 184]:

"(1) Is the work a part or process in the trade or business of the employer? And (2) does the employer retain supervision or control over the work of the contractor?"

In that case the question was whether the man injured was the employee of an independent contractor or the company which engaged the contractor.

Of the various tests of the employer-employee relationship indicated by these cases, the evidence here fails to give a definite answer as to who had control over the details of the work being done and as to whose obligation it was to do the work. Resorting to the other tests, viz., hiring of the workman, right of dismissal, and payment of wages, we are compelled to hold that Miller was not the employee of Farmington City. He was either an independent contractor or the employee of Griffith.

The order of the Industrial Commission denying compensation must be affirmed.

MOFFAT, C. J., and LARSON and PRATT, JJ., concur.

WOLFE, Justice (concurring).

I concur reserving therefrom agreement on the statement that the question whether Miller was employed by Farmington City or by Griffith is jurisdictional. I think the same result might be arrived at by determining whether the Commission drew the proper legal conclusion from the facts which, except in minor details, are not in conflict. It is true that in *Weber County-Ogden Relief Committee* v. *Industrial Commission,* 93 Utah 85, 71 P. 2d 177, we held that the question of employment was jurisdictional. I concurred, but my concurrence was on a narrow ground. In that case, as in this, I think it was unnecessary to hold that the question of employment was a jurisdictional one, because in that case the facts were undisputed and it was a matter of determining whether the Commission made the proper legal conclusion. In *Holt* v. *Industrial Commission,* 96 Utah 484, 87 P. 2d 686, the question was whether the employer was subject to the Act, which is a jurisdictional question. While the logic of the argument may be with those who argue that if the question of whether an employer is subject to the Act is jurisdictional the question of whether the employee is so must also be jurisdictional, there may be a difference in practical administration. When it is determined that an employer is subject to the Act, the question is then whether the applicant who claims to be his employee is entitled to compensation. That depends on (1) whether he is an employee; (2) whether he was injured; (3) whether the injury was caused by an accident; (4) whether the accident arose out of or in the course of the employment; (5) whether he suffered disability. Lack of any one of these elements excludes recovery. I am not prepared at this time to say whether the issue of whether or not he is an employee is any different in nature or more a matter of jurisdiction than are any of the other elements. The matter becomes important because we weigh the evidence on jurisdictional questions whilst on other questions we accept the factual conclusion of the Commission, if there is evidence to sustain it. Hence,

where the line is drawn which separates jurisdictional facts from other facts becomes for that reason important. It determines the scope of one's examination of the record.

I am not prepared to say that *Crowell* v. *Benson,* 285 U. S. 22, 52 S. Ct. 285, 76 L. Ed. 598, definitely holds that the question of employment is jurisdictional. That case went off on the point that if the federal courts could not pass on the question of whether or not one was an employee under the Longshoremen's and Harbor Workers' Act, 33 U. S. C. A. § 901 et seq., the findings of the Commission on such fact might be an invasion of the constitutional power of federal courts over admiralty matters. Until the matter comes squarely before us for decision, I prefer to withhold my judgment on that matter.