## STOVER BEDDING CO. et al. v. INDUSTRIAL COMMISSION et al.

No. 6167.   Decided November 12, 1940.   (107 P. 2d 1027.)

*Clarence Baird* and *F. A. Trottier,* both of Salt Lake City, for plaintiffs.

*Jos. Chez,* Atty. Gen., and *J. Allan Crockett,* of Salt Lake City, for defendants.

McDONOUGH, Justice.

Review of an order of the Industrial Commission awarding compensation to Olga. F. Knudsen on account of the accidental death of her husband. Two questions are raised by plaintiffs: (1) Whether the evidence supports the finding of the Commission that the deceased, George A. Knudsen, was at the time of the accident an employee of Stover Bedding Company, hereinafter called the plaintiff; and (2) whether the evidence supports the finding that Smith and Davis Company was not subject to the Workmen's Compensation Act of Utah, Rev. St. 1933, 42-1-1 et seq.

Prior to his death George A. Knudsen was a salesman for plaintiff company. He was also a salesman for Smith and Davis Company, manufacturers of. iron beds and couches. Each company knew of, and acquiesced in, Knudsen's relationship with the other, the products which each company manufactured being non-competitive. Knudsen endeavored to sell the products of the two companies throughout his territory. It is undisputed that at the time of his death he was returning from a sales trip in Idaho where he had made sales for both companies.

The first question to be determined is whether Knudsen was an employee of Stover Bedding Company, or whether his relationship with plaintiff was that of independent contractor. We have on several occasions held that such is a jurisdictional question, which we must decide upon a preponderance of the evidence. *Angel* v. *Industrial Comm.,* 64 Utah 105, 228 P. 509; *Luker Sand &*

*Gravel Co.* v. *Industrial Comm.*, 82 Utah 188, 23 P. 2d 225; *Norris* v. *Industrial Comm.*, 90 Utah 256, 61 P. 2d 413; *Holt* v. *Industrial Comm.*, 96 Utah 484, 87 P. 2d 686; *Miller* v. *Industrial Comm.*, 97 Utah 226, 92 P. 2d 342.

However, as will presently appear, the competent evidence in this case is essentially uncontradicted. The task presented, therefore, is not strictly that of examining the record to determine whether the evidence preponderates against the conclusion of the Commission but that of determining whether the Commission drew the correct legal conclusion therefrom.

There was no written contract between deceased and plaintiff company, but much of the evidence is undisputed. Knudsen was supposed to sell plaintiff's products, together with the products of Smith and Davis Company. He was not specifically limited as to territory, but he confined his efforts to Utah, Idaho and Wyoming. He received no instructions as to where he should go, when he should go, or how he should conduct his work. He furnished his own means of transportation, paid all his own expenses, and used his own judgment concerning what trips he should make and when he should make them. Mr. Stover, of the plaintiff company, testified that he had no right to control deceased's movements or manner of doing his work—and that he did not in fact do so. Applicant herself stated that her husband could work where and when he chose.

It is to be noted that the testimony of applicant relative to the work done by deceased and as to his compensation, hereinafter adverted to, is hearsay based upon conversations had with deceased.

The only dispute in the evidence, hearsay or other, arises as to how Knudsen was paid for his services and whether he was required to work at plaintiff's factory when not out on sales trips. As to the latter question, Mr. Stover testified that deceased was never required to do any work around the factory; that deceased did some work voluntarily but only with respect to prospective buyers or for the purpose

of making sales. Mrs. Knudsen testified that her husband had done work at the factory and that he had been called there for that purpose; that the only work which she knew he had done was to answer the phone at the factory office, take care of prospective buyers, and prepare certain exhibits of furniture. All of these acts may have been done for the purpose of making sales, and are therefore equally consistent with the relationship of independent contractor as with that of master and servant. There is no evidence that Knudsen was required to do any work at the factory or that he did so, except what he might voluntarily do in furtherance of his own interests—that of making additional sales.

With respect to the manner and rate of pay, and the basis on which Knudsen was supposed to be paid, there appears to be more dispute. In fact, the record discloses that the parties seemed to feel that whether Knudsen was paid a salary or a commission was the important element in determining whether he was an employee or an independent contractor. While it is true that the manner and basis of payment is one element to be considered in determining the relationship, it is by no means conclusive. *Rockefeller* v. *Industrial Comm.*, 58 Utah 124, 197 P. 1038.

It appears that the basis on which deceased received compensation for his services was the amount of his sales, but instead of receiving a strict commission on such sales, he was given a definite allowance each month. While this allowance was based on the amount of sales made over a given period, it was nevertheless a specific sum received monthly, irrespective of sales made during that month. At various times the deceased and plaintiff company would make a settlement, and if the amount of sales made by deceased was greater or less than anticipated, adjustment was made as to future payments to deceased to equalize the difference. Thus, the amount deceased was to receive each month for the first three months of 1939 was reduced from $250 to $200 because he had not made as many sales in

1938 as anticipated—on the basis of which he had been receiving $250 per month.

The testimony of the bookkeeper and auditor of plaintiff company supports this view. The auditor testified that there was a definite understanding that if the amount of sales fluctuated the amount Knudsen was to receive would vary, but that he was to receive around $250 per month. Mr. Stover himself testified that Knudsen had been allowed a drawing account of $250 per month, based on amount of previous sales. At various times, usually at the end of the year, they would get together and make a settlement or adjustment, but that such settlement or adjustment applied only as to future payments to deceased.

Applying to the facts the tests heretofore laid down by this court for determining whether an individual is an independent contractor or an employee under the Workmen's Compensation Act, we must conclude that George A. Knudsen was an independent contractor, engaged in selling the products of plaintiff company. The competent evidence shows that there was no control or right of control over the details of Knudsen's work as a salesman. Nor was Knudsen paid a definite specific salary for his services (although the evidence indicates that deceased was paid a specific sum over certain periods of time, which sum was based on the amount of estimated sales.) The evidence also shows that Knudsen was engaged in selling for other companies while selling for the Stover Bedding Company.

A case very similar to the one here involved is *Badger Furniture Co.* v. *Industrial Commission,* 200 Wis. 127, 227 N. W. 288, 289. The salesman in that case received a commission for all sales made; he paid his own expenses and furnished his own car. He was allowed to sell anywhere in Wisconsin and was not required to make any daily report to the company. The court set out the tests to be followed for determining whether an individual was an employee or independent contractor as follows:

"In reaching a conclusion, of course, there are other things to be considered besides the question of control, to wit: The nature of the business or occupation; which party furnishes the instrumentalities and tools; the place of work; the time of employment; the method of payment; and the intent of the parties to the contract."

Applying those tests to the facts in that case, the court held that the salesman was an independent contractor. See also *Peters* v. *California Building-Loan Ass'n,* 116 Cal. App. 143, 2 P. 2d 439; *Arne* v. *Western Silo Co.,* 214 Iowa 511, 242 N. W. 539. Contra, see *Maltz* v. *Jackoway-Katz Cap Co.,* 336 Mo. 1000, 82 S. W. 2d 909.

Applicant cites the case of *Commercial Casualty Co.* v. *Industrial Comm.,* 71 Utah 395, 266 P. 721, as controlling in this case. However, it is readily distinguishable. There the books of the company listed deceased along with other employees as a soliciting agent at a rate of compensation of $200 per month and the company in its reports to the Industrial Commission and the insurer listed the deceased as an "employee."

Having concluded that deceased, George A. Knudsen, was an independent contractor under the Workmen's Compensation Act, it becomes unnecessary for us to discuss the other question involved. The decision of the Industrial Commission awarding benefits to the applicant, Olga F. Knudsen, is reversed.

MOFFAT, C. J., and LARSON and PRATT, JJ., concur.

WOLFE, Justice (dissenting).

I dissent. In this opinion, after discussing the applicable provisions of the Workmen's Compensation Act, I shall consider the development of the doctrine of respondeat superior in the light of its historical antecedents. I shall endeavor to demonstrate that the doctrine sloughed off its ancient roots and expressed merely a policy of the law designed to give recovery against a master who, even though he was without fault, was required to respond for the negli-

gence of his servant for injuries committed while in pursuance of the master's business. Various reasons were then given to justify the policy, including the one that the master was the motivating cause—a rough "but for" doctrine and the one that since the business reaped the benefits it should bear the burdens—a limited compensation idea. I shall then endeavor to show by following the history of the early cases in reference to the independent contractorship doctrine, how this doctrine grew up as an attempt partly to escape from the rigors of the doctrine of respondeat superior and how the control test grew out of the fact that an independent contractor exercised an independent calling—a fact of which the courts have largely lost sight.

All this will lead to the conclusion that in remedial social legislation a paper independent contractor relationship based on subtraction of right of control as to means and methods should not take it out of the employer-employee relationship unless the so-called independent contractor really is engaged in an independent calling.

The question propounded by the decision as to whether Knudsen was an employee or independent contractor is, in the main opinion, resolved according to the tests laid down by decisions respecting the doctrine of Respondeat Superior. This doctrine grew up in the legal climate of tortious responsibility. The *tests* of master and servant and its so-called exception, independent contractorship, were evolved in the historic development of this doctrine and with the purpose in mind of subserving it. But in Workmen's Compensation we have no such thing as tortious responsibility— no principle of respondeat superior. Should not the tests of employer and employee viewed in relation to the Act and the purposes it was meant to serve be re-examined in the legal climate of that Act and present day conditions? With the help of many able legal scholars I shall make a superficial attempt to do so. But before I begin that not too easy task, I call attention to the very language of 42-1-41, R. S. U. 1933, which defines and enumerates "employees." The

definition does not attempt to give the tests of master and servant as they grew up in the common law. It states that employees "shall be construed to mean * * * All persons * * * *in the service* of any employer." (Italics added.) It then goes on to define the type of employer who must be served by the employee before the latter may come in under the Act. An employer under the terms of the Act is one employing "three or more" regularly in the same business or in or about the same establishment, and under any contract of hire, express or implied, oral or written, but excluding, in counting the number of employees who would serve to bring him under the Act, all casual employees and all not employed in the regular course of business. It is to be noted that in determining whether an employee is one who comes under the Act by reason of serving an "employer" as defined by the Act, the definition of "employer" is slightly different from the definition of "employer" in 42-1-40, R. S. U. 1933, which designates the employers who are subject to the Act. In the latter section agricultural laborers and domestic servants are not counted in determining whether an employer has three or more, but under 42-1-41 (2) these are not excluded except as they may be classed as employees who are not regularly employed in the business. Ordinarily a domestic servant would not be employed in an employer's business. Whether it would be necessary to synonymize the test of an "employer" who is subject to the Act with the test of "employer" as an element in determining who is an employee permitted benefits under the Act, need not now be determined. The potent words of the section are persons *in the service* of any employer" as the latter is defined in 42-1-40 (2). These words "in the service" may have a wider connotation than that of master and servant as known in the common law. This is borne out by the latter part of 42-1-40 where certain contractors, his employees and all subcontractors are to be "deemed" as employees of the original employer. The contractor to whom this touchstone applies is, of course, one "over whose *work* he [the employer]

retains supervision or control," but it is not clear whether the employer must retain control and supervision over the means and methods of work or just the work as it is finally presented as "a part or process in the trade or business of the employer," Assuming that it is the former and that no point may be made of that passage to sustain the thesis that "persons in the service" is broader than the ordinary servant or employee, we come to the last sentence of 42-1-40 which, it seems to me, undoubtedly gives countenance to the thesis. It reads:

"Any person engaged in the performance of work as an independent contractor shall be deemed an employer within the meaning of this section. The term 'independent contractor,' as herein used, is defined to be any person engaged in the performance of any work for another, who, while so engaged, is independent of the employer in all that pertains to the execution of the work, is not subject to the rule or control of the employer, is engaged *only* in the performance of a *definite job or piece of work*, and is subordinate to the employer only in effecting a result in accordance with the employer's design." (Italics added.)

The element reading "is engaged only in the performance of a definite job or piece of work" seems to point definitely to the conception of the old cases hereafter alluded to, to wit: that only those were to be considered as independent contractors who were employed because of a special calling or otherwise to execute a definite job or piece of work which, after completion, dispensed with the relationship. Where the job to be done was in its nature of the sort which fitted into the mosaic of the total business which the alleged employer was carrying on, was of a continuous nature, and the worker did not exercise an independent calling in serving the general public or a class of the public, the Act intended by its language and implications to include him. Knudsen was of this type.

This case is strikingly like that of *Maltz* v. *Jackoway-Katz Cap Company*, 336 Mo. 1000, 82 S. W. 2d 909, 916. Some important details in that case are undisclosed in this and

some details in this case favor more the concept of independent contractorship whilst other details favor it less. In the Maltz case, as in this, the salesman carried two lines of goods which were complementary—hats for one firm and caps for another. Here Knudsen sold beds for one company and bedding for appellant. The Missouri court said that the "duality of his employment did not affect his status." Said also the Missouri court: "The relationship is bottomed on services." In this case Knudsen received *definite* compensation. True, it was readjusted from year to year on the basis of the business produced, but as states the main opinion "he was given a definite allowance each month * * * irrespective of sales made during that month." The Maltz case is in that regard weaker. Maltz was given 10% commission, 75% of which he could draw out upon acceptance of orders obtained by him in "St. Louis and vicinity." Maltz, like Knudsen, "furnished his own means of transportation, paid all his own expenses, and used his own judgment concerning what trips he should make and when he should make them." In the Maltz case, unlike the instant case, a number of "daily-report sheets" were sent in by Maltz but these were to give data on customers, their reasons for not buying, etc., rather than to keep check on the salesman. He did not make said reports continuously. The time, number and methods of sale were not dictated by the employer but were largely dependent upon the ability and judgment of the salesman and involved a large amount of discretion, "but the company frequently stressed the number of days salesmen would work, wanted them to work as much as possible, but so long as the company believed the salesman was working reasonably sufficiently the company made no effort to dictate his days or hours of work, and on the whole a salesman was permitted to use his own judgment in that matter." One with an inclination to distinguish the Maltz case from the instant case may do so perhaps on the ground that this language shows that in the former case the company had the power to control, al-

though it made no effort to do so and permitted the salesman wide discretion, whilst in this case there was no power to control. If the investigation is to stop there, such distinctions may suffice for those who are not interested in the broader aspects and purposes of the Compensation Act. It would seem that if its purpose is to administer and distribute the risk, to substitute for those disabled in industry certainty for precariousness of recovery, including one who is clearly an employee-salesman, the same purpose should extend the coverage of the Act to one who actually did all that such admitted employee-salesman, did, who could do no more, and who was to all intents and purposes in exactly the same economic and practical position. One in Knudsen's position may have the satisfaction of thinking that his movements cannot be controlled, but that is an empty satisfaction when he considers that he is subject to having his relationship severed at any time on short notice. That right to terminate the relationship at any time, in effect, gives the company control. I refer to my opinion in *Fuller Brush Company* v. *Industrial Comm.*, 99 Utah 97, 104 P. 2d 201, at page 207, 129 A. L. R. 511, for a discussion of indirect control through the advantaged position of the one who has the job to give or take away.

Literally hundreds of cases involving consideration of the tests which distinguish the master and servant relationship from that of independent contractorship might be examined and cataloged according to the emphasis given each test, but after all this were done we would be required to resort to the language of our statute in order to ascertain the tests which the Legislature intended should govern here. Certainly it did not intend that, by changing the legal form of the contract obligations could be avoided where in actuality the same employer-employee relationship was present. I doubt furthermore, as before intimated, that it intended that a mere subtraction of control in relationships which, after such subtraction, remained in fact the same, was meant

to take from the applicant the benefits of the Act. In support of this idea I again call attention to 42-1-40 and 42-1-41.

Professor Paul A. Leidy in an article entitled "Salesmen as Independent Contractors," 28 Mich. L. R. 365, questions the "control test" in cases where the other party to the contract fits as a cog into a regular organization and carries on no independent business. The true and basic ground in *Milligan* v. *Wedge,* 1840, 12 Adol. & El. 737, for holding the drover to be an independent contractor was not absence of "right of control" but that he was called on by the defendant butcher to exercise *his* (the drover's) usual business for a special job—to wit, driving cattle through the streets of London. This was the real reason he had no right of control and was therefore not the servant of the butcher. He was a licensed drover engaged independently in that business. When one is called from his own business to supply expert services—as a factor, a lawyer, a doctor, a driver of a taxi cab—to perform for another, the hirer would not intend to claim the right to interfere or exercise control over the acts or means of the one hired. He engages the expert because the latter ordinarily knows how to do that particular job for which he is engaged better than the one who engages him. He bargains for a result. One may make himself liable for the negligence of an independent contractor by interfering with his way of doing the job. Conversely one cannot escape the application of the principle of respondeat superior simply by failing to exercise control where the character of the work is such as would ordinarily fit the master and servant relationship. If so, I might change my old cook who knew my desires and idiosyncrasies into an independent contractor by simply contracting that he effect the continuous job of getting three meals a day, choosing the menus and exercising full discretion as to the means and methods of cooking and of cleaning up, a matter I would hardly be competent in any event to control. But if I employed a caterer—one who

exercises an independent calling to furnish my meals—the case would be different.

Said Lord Denman in *Milligan* v. *Wedge,* supra:

"The party sued has not done the act complained of but has employed another who is recognized by the law as exercising a *distinct calling.*" (Italics added.)

Justice Williams in concurring said:

"The butcher here, whom we can not assume to be acquainted with driving, deputes a person to drive, who understands the business, and whose servant is guilty of negligence that produces the injury. That person, therefore, is the party liable."

The emphasis was put on the fact that the services were taken from the special pool of services furnished by a man independently holding himself out to perform them. The services rather than the man were employed. Somewhat the same test is seen in paragraph (c) of Sec. 19 (j) (5) of our Unemployment Compensation Act, Laws 1936, Ex. Sess. c. 1, as amended by Laws of 1937, c. 43. Shearman & Redfield on Negligence, 6th Ed., p. 395 states:

"Although, in a general sense, every person who enters into a contract may be called a contractor, yet the word, for want of a better one, has come to be used with special reference to one who, in pursuit of *an independent* business, undertakes to do a specific piece of work for other persons using his own means and methods without submitting to their control in respect to all its details. The true test of a 'contractor' would seem to be that he renders service in the *course of an independent occupation,* representing the will of his employer as to the result of his work, and not as to the means by which it is accomplished." (Italics added.)

Knudsen could not be said to have been exercising a separate calling out of which came the services rendered to appellant. He was an indispensable link in plaintiff's business, part of which was selling the goods he made. If Knudsen had maintained an establishment holding himself

out as a factor or "manufacturer's agent" to whom goods of various producers were consigned or bailed for sale, the case would have been different. Professor Leidy suggests that the manner of accounting for the compensation paid may give an indication of whether the so-called independent contractor is simply a part or regular member of the organization or a "selling agency." If such person is normally listed on the payroll for compensation purposes, one whose checks would normally be thrown into the 'labor and salary' account or 'selling expense account' rather than into that account into which an auditor would place services expended for attorney's fees, auditor's fees, it would indicate that such person was a regular member of the defendant's organization."

I have stated that the *tests* of master and servant developed in relation to the doctrine of respondeat superior. That is not the same as saying that the *relationship* of master and servant developed in the atmosphere of respondeat superior. The latter doctrine evolved as an incident to the master and servant relationship. The geneology of the concepts of respondeat superior reaches back into the mists of antiquity. I shall refer briefly to the studies made in this regard by some of our eminent legal scholars and their conclusions under the headings (1) "Origin and Development of Doctrine of Respondeat Superior," after which I shall treat in successive order (2) "The Relationships to which the Doctrine is Applicable and Exceptions thereto," including the so-called "exception of independent contractor," (3) "Tests Developed and Applied to Determine the Relationship in Respect to the Application of this Doctrine," (4) "The part which 'Control' should play in Determining whether the Relationship is one in which the Doctrine should apply," (5) "Should the Factors used to Determine whether the Relationship of Master and Servant exists for the Purposes of Ascertaining whether the Doctrine of Respondeat Superior Applies be the same or be given the same Emphasis in determining the Relationship of Em-

ployee in Workmen's Compensation or other Fields in which the Obligations imposed because of the Relationship arise by Statute and not by Negligence, Trespass, Fraud, Deceit, Violation or other Common Law Duties?"

I. Origin and Development of Doctrine of Respondeat Superior. As to the origin and development of the doctrine of respondeat superior: The field of vicarious liability is broader than that of respondeat superior. But we are concerned now only with that doctrine. O. W. Holmes, Jr. in 1882, long before he was Mr. Justice Holmes, delivered, while a professor in the Harvard Law School, two lectures published in Vol. IV and V of the Harvard Law Review starting at pages 345 and 1, respectively. In these and in an essay entitled "The History of Agency," republished in Select Essays in Anglo American Legal History, Vol. 3, he advances the thesis that the doctrine is a survival of the earlier doctrine of identity of *persona,* which in turn traces its ancestry to the *patria potestas* of the civil law and the frithborh or frank pledge introduced at the time of the conquest. Under the Roman Law, says Holmes, the "family rights and obligations were simply attributes of the persona of the family head * * * For that purpose they were one with the pater familias." Thus rose the principle of identy among the family and "* * * the familia," Bracton says, "embraces those who are regarded, in the light of serfs * * *. So, too, as well freemen as serfs and those only whom one has the power of command." This tended toward a fictitious identification of agent with principal.

We shall leave Holmes for the moment and go to Wigmore who also wrote learnedly on origins of tortious responsibility for the acts of another. He traces such responsibility to the "primitive notion which instinctively visits libility on the visible offending source whatever it be, of a visible result." This was applied to animals, things. and persons. The notion as applied to persons is that of the schadliche Mann, a person from whom some evil result has proceeded." See John Henry Wigmore: "Tortious Responsibility" in

three parts, 7 Harvard L. R. 315, 383 and 342, revised and collected as one essay, page 474, Vol. 3, Select Essays in Anglo American Legal History. Wigmore bases his conclusions largely and primarily on the "Origin and Development of Moral Ideas," by Westtermarck, and "Deutsche Rechtsgeschichte" by Brunner, in addition to writings of Post, who also made original researches into the laws of the Germanic tribes. None of the present refinements were made in early times between cases where the harm came from (1) pure misadventure without fault; or (2) from no intention to injure but from culpable want of precaution and foresight; or (3) where there was actual design to produce the harmful results which basically now distinguishes our criminal from our civil law. The "indiscriminate liability of primitive times stems from an instinctive impulse, guided by superstition, to visit vengeance upon the visible source, whatever it be—human or animal, witting or unwitting—of the evil result." This was universal in primitive times. It appears not only in the stricly Germanic people but the records of the race stocks, however mixed, of past Christian Europe—the Scandinavian, the Flemish Dutch, the Celtic, the French, the Spanish, the Italian, the Slavic, the Hungarian. It is found in earliest Greece and earliest Rome. It is equally marked in the Semitic races —the Jews, and Mohammedans, as well as their predecessors in Chaldea and Egypt and in the totally unrelated Hindus and Chinese, as well as the Japanese. Wigmore refers to his sources for substantiation. From this primitive notion of absolute liability the development was to a differentiation between pure mishap, harm caused by carelessness, and intended harm, through several stages exemplified by the growth in categories classified by Wigmore as (a) Harm Connected with a Personal Deed; (b) Harm Connected with Animals; (c) Harm Connected with Inanimate Things; (d) Harm Connected with Servants, through which the lineage of respondeat superior is traced. The others were collateral applications of the primitive notions here-

tofore spoken about. The first servants were serfs. "There certainly was a time when the master bore full responsibility for the harmful acts of his serfs or domestic." The responsibility disappeared in case of freemen as time went on so that the master could relieve himself by handing his servant over to the regular courts and this apparently worked a complete discharge. But in the case of serfs and domestics the effect of surrender was at first merely to relieve from the blood feud and the payment of peace money; it put the situation on the footing of a 'misadventure,' as then conceived, that is, it left the master liable to pay compensation money." "Then comes the final step of allowing the value of the surrendered slave to be set off, and finally, the complete exoneration by surrender of the slave, at first to the injured family, then to the courts of justice."

Then "In Norman England" reappeared the idea that it "made a difference whether the master consented to or commanded the harm to be done by the servant or other member of the household." Thus by the end of the 1200s the rule was, in all probability, that the master could pretty well exonerate himself from penal results by pleading that he had not commanded or consented to the act. The distinction between conscious harm and unintentional harm had been established. But the civil liability still continued regardless of command or consent. See W. S. Holdsworth's "History of English Law," Vol. VIII, p. 446 et seq.

From the end of 1200 to 1850: Wigmore traces the notion of tortious civil responsibility through ethical legal groupings instead of through groupings based on the source of the harm for the reason that the "subjective course of legal thought in its progress toward the accepted standards of today" has abandoned the old differentiations of source and lends itself most readily to the ethico-legal groupings of harm done (1) Intentionally and Personally; (2) Harm Done in Self-Defense; (3) Harm Done by an Infant or a Lunatic; (4) Keeping of Fire; (5) (a) Keeping of Animals

in Reference to Land Trespasses; (b) Trespasses by Biting, etc.; (6) Keeping Dangerous Things in General; (7) Harm Done by a Servant or Agent. Here, again, we are for this study interested mainly in the last, and here we are permitted only a sketchy review. Wigmore takes up the development in three periods. (a) the period beginning with Edward I's time around 1300; (b) the period beginning with Lord Holt's time around 1700; (c) the period beginning with Lord Kenyon's time around 1800 reminding us again that:

"* * * in the primitive Germanic idea the master was to be held liable absolutely for harm done by his slaves or servants; that, in later Germanic times, the master could exonerate himself by surrendering the offending person, and at the same time taking an exculpatory oath, 'se in hoc non conscium esse,' 'quod pura sit conscientia sua;' that on English soil, in the early Anglo-Norman period this idea of responsibility appeared in the shape of exoneration for deeds of the servant not commanded or consented to; but that in that period the test of Command or Consent had hardly begun to be applied to responsibility in what we now term its civil aspect, and, while common in penal matters, was by no means fixed in its scope."

Without any mention or allusion to the extracts from cases ranging over the period of 1300 to 1700 given in support of his conclusions, I quote the conclusion:

"It will be apparent to one who studies the following cases that for a century or so the undercurrent of feeling was still that the master bore absolute civil responsibility for his servant's doings; that the extension of the Command test had to make its way against what may be called the presumption to the contrary, and that it came first in cases (such as fraud) more nearly related to the sort of conduct to which it was already recognized to apply, that is, morally reprehensible acts; and that it can hardly be found to be accepted as a general rule in trespass, etc., until early in the sixteenth century."

"In the cases in the 1500s and 1600s there further appears the refinement which may be termed the doctrine of Particular Command, i. e., the doctrine that the master, to be liable, must have commanded the very act in which the wrong consisted (unless the command had been to do a thing in itself unlawful). It was somewhat by way of a reaction against this refinement that the form of the rule began to change under Lord Holt; and to this next stage we now come."

The growth from the Particular Command doctrine to the doctrine of Implied Command, i. e., General Command or Authority as moulded by the practicalities and necessities of the growing industrial age during the period of 1700 to 1800, furnish a splendid illustration of the richness of meaning of Holmes' famous passage taken from page 1 of his "Common Law:" "The life of the law has not been logic; it has been experience. The felt necessities of the time, the prevalent moral and political theories, intuitions of public policy, avowed or unconscious, even the prejudices which judges share with their fellow men, have a good deal more to do than the syllogism in determining the rules by which men should be governed." And it should furnish us courage to examine in the light of these new statutory obligations the comparative value of old tests for determining the relationships on which these statutory obligations impinge. Dean Wigmore's narration of this change and the reasons therefor are too meaty to be synopsized. I quote verbatim:

"We may here pause for a moment to consider the situation at that time. [1700] It is obvious that the Particular Command doctrine, if pushed to its logical extreme (as it was apparently coming to be), must have resulted in putting very narrow limits on the principle of responsibility for servants' and agents' doings. The doctrine would require, in effect, that the master should be liable (unlawful errands apart) only when the deed in all its details had been expressly and specifically commanded; and the arguments in Southern v. How, suggest the practical consequences of such a rule. Now, whether or not such a limited rule would have been desirable, it is certain that the circumstances of the time forced upon the judges a serious consideration of the expediencies of such a rule. The nation was reaping in commercial fields the harvest of prosperity sown in the Elizabethan age and destined to show fullest fruition in the age of Anne. The conditions of industry and commerce were growing so complicated, and the original undertaker and employer might now be so far separated from the immediate door, that the decision of questions of masters' liability must radically affect the conduct of business affairs in a way now for the first time particularly appreciated. A time had come when persons administering the affairs of others could no longer be classed indiscriminately as 'servants,' at the beck and call of the

master for each bit of work,—a time when in social development the position of a factor or agent vested with more or less authority and discretion was in fact no longer that of a servant. It was therefore natural that the judges should find themselves forced to consider, (1) the practical expediency of the traditional test of liability, or (2) if they should revise it, the expression and presentation of the test as revised.

"On the first point, it is clear that they did in effect revise it. They determined (whether rightly or wrongly need not be here considered) that practical expediency could not put up with the logical consequences of the Particular Command test.

"As to the second point, the new phrasing, there was much uncertainty for a time, indeed for a century or more; but naturally enough the existing test was laid hold of and modified to suit their needs; and after all it was in itself fairly adapted to answer for the test which they thought just. The test now became what may be termed the rule of Implied Command from a General Command or Authority. At the same time, amid the general reconsideration, other phrasings of the test were sometimes vouchsafed. 'Whoever employs another is answerable;' 'acting in the execution of authority;' 'acting for the master's benefit;' 'being about the master's business,'—these appear as tentative expressions in the general effort to re-state on a rational basis. But the old test, in its broader scope, is still dominant in the last half of the new century:

"1. The form and phrasing of the test. From the arguments in Boucher v. Lawson and the passages of Blackstone, it may easily be seen how the idea of Express Command was naturally enlarging itself into that of Implied Command, a Command to be implied or posited from a general commission to do a class of acts. 'Whatever a servant is permitted to do in the usual course of his business,' says Blackstone, 'is equivalent to a general command.' 'Where he acts in execution of any authority,' says counsel in Boucher v. Lawson; and this is the dominant phrase with Lord Holt. 'It may be presumed that he acts by my authority, being about my business,' is another phrase of his. The new terms are natural enough and hardly call for explanation. It may be suggested, however, that 'authority' was particularly easy of adoption because about this time it seems to have had, as a primary sense, the concrete meaning of a specific order (not merely the power itself, abstractly regarded). As the full meaning of the situation was realized, it was inevitable that the broader terms 'scope of authority,' 'exercise of trade,' 'course of employment,' should prevail; but this was not yet to be.

"2. The reasons offered for the rule. As already observed, we find first under Lord Holt an effort to put the rule on a rational footing of policy,—an effort which, owing to inherent difficulties, has not yet by any means ceased. Usually some definite ground of policy, more or less tenable, was offered. Lord Holt's reasons are in substance covered by his brief sentence in Wayland's Case, 'It is more reasonable that he should suffer for the cheats of his servant than strangers and tradesmen,' because it is he (Hern v. Nichols) who 'puts a trust and confidence in the deceiver,' and (Armory v. Delamirie, per Pratt, C. J.) 'gives a credit' to him. Blackstone, tracing the harm back to the original command of the master, says 'no man shall be allowed to make any advantage of his own wrong.' Lord Hardwicke (Boucher v. Lawson) tries to strike a fair balance between the 'security' which others ought to have who trust the servant and the 'security' which masters ought to have from wayward employees. But very often the judicial mind gave up the troublesome task of accurately expressing a reason, and, quite content with the policy of the rule, took refuge, when it came to naming a reason, in a fiction or other form of words. 'The master undertakes for the servant's care,' said Lord Holt, in Boson v. Sandford; which of course is not true. The favorite expressions of this sort, however, were 'the act of the servant is the act of the master,' when done in execution of authority (Middleton v. Fowler, Jones v. Hart), and 'qui facit per alium facit per se' (Blackstone) ; and perhaps 'respondeat superior' has often been used thus to evade giving a clear reason. Now here it must be noticed that there are different ways of employing a fiction. One is to accept as a guide a traditional element, though it no longer answers to the notions of the day, and to insist upon its use; as when the loss and finding are alleged in trover, or the loss of service in seduction. In the former instance the allegation is now recognized as a pure and ineffectual fiction; in the latter, except in some states, the loss of service must still be proved, though the whole basis of the claim rests to-day on other notions. A very different way is to employ a fiction to sanction a rule which we thoroughly believe in, but lazily prefer to evade accounting for openly and rationally. Of this sort is the instance in hand. Sometimes, as where in a document under seal the seal is said to presume a consideration, we borrow some kindred doctrine and force it to our present use; but sometimes, as here, we put forth a phrase not already used for the purpose, but now found very handy. So that what we have to remember about the employment of the above fiction of Identification, in the history of the present doctrine, is, (1) that it was merely a reason, an easy, concise reason, which was put forth to sanction and support a rule of whose practical expediency the Courts were perfectly satisfied; (2) that it was merely one of several reasons, and by no means the most common, and that,

in short, the rule would have stood substantially as it does now, if all reference to the Identification fiction were wanting."

Wigmore here questions the part which Mr. Justice Holmes gave to the Identification theory in early history. Wigmore does not find the "out and out identification expressions" in vogue until Blackstone's time and then not as expressions of identity of persona but as terse ways of stating a legal result. The result being that when a servant acts for his master it is in law the same as if the latter had done the act. And indeed: Pollock and Maitland in a note, page 535, Vol. 2, "History of the English Law," state that Mr. Justice Holmes, 7 Harvard L. R., 354, ascribes to this fiction a greater efficacy than we can allow it, at all events in the sphere of torts, stating in the text "we cannot believe that either law or morality was guilty of any theory of 'identification.' "

The development from 1800 on appears to have been one of solidification of the rule of command implied from general authority phrased in terms of "scope" or "course" of employment, "scope of authority" or more accurately by Keating, J., in Bolinbooke 1. Board [1874] L. R. 9 C. P. 577, "in furtherance of and within the scope of the business with which he was trusted.

We shall not detain ourselves in this study with the question of the extent of the field of action in which the servant or agent may act and still visit liability on his master or principal. For our purposes it is enough to know that it is beyond the line of specially commanded acts or acts assented to before or after (ratification) which draw liability to the principal. Acts done by the servant in a careless manner differently from the manner in which he was expected to do them, if done in the scope of his employer's business and in furtherance of it impute liability. What is the "scope of the business" itself presents troublesome questions even if we assume that it is a *servant or agent* who performs the act. Our real job is to determine, as we

shall soon see, when he is or is not such a servant or agent as will make the employer responsible. It is true that one of the tests of this will be the kind of errand which he was on when the occurrence happened. If on a "frolic of his own" it will not be the employer's act because even though he was ordinarily a servant he departed from the servant-hood in such venture. Our difficulty will not be one of determining when an acknowledged servant parted from the way of his master but whether or not the relationship of master and servant or principal and agent really existed. This will come under the second and third divisions of this study. We shall end this division which treats of the Origin and Development of the Doctrine of Respondeat Superior by noting, by way of summation, the various conceptional theories, reasons, justifications, and explanations of and for the doctrine. The literature ranges from historical re-searches into conceptional roots to pragmatic justification. There is the Identification theory—and it is after all only a well argued hypothesis—of Holmes, who thought the whole doctrine of vicarious liability illogical and with few exceptions, unjustifiable because "common sense was op-posed to making one man pay for another man's wrong unless he actually brought the wrong to pass." He traced it to the fiction of Identification which had long lost any vitality as a conception but which Holmes claimed had in logic alone fructfied into the doctrine of respondeat su-perior.

Mr. Frank W. Hackett under the title "Why is a Master Liable for the Tort of a Servant?", in Harvard L. R., 107 (May 1893) evidently without the benefit of Wigmore's two articles (January and March, 1894, but same volume) shrewdly guessed that the origin was indignation and re-sentment at the person who caused the injury which carried over to the employer. Then came Wigmore's profound studies, which have been sketchily outlined above, which traced the conceptional origin of the doctrine to the primitive ideas of justice and reparation. But Wigmore thinks that

regardless of its source the doctrine may now be justified on grounds of public policy and states that perhaps the nearest approach to theoretic adequacy is that of Lord Brougham in *Duncan* v. *Findlater*, 6 Cl. & F., 894, 910:

"I am liable for what is done for me and under my orders by the man I employ * * * and the *reason* that I am liable is thus, that by employing him *I set the whole thing in motion*, and what he does, being done for my benefit and under my direction, I am responsible for the consequences of doing it." (Italics added.)

This "moving clause" theory is somewhat akin to Professor Seavey's idea of the Master as a Cause.

"* * * by entrusting an instrumentality to a servant who causes an injury by its use, the master has caused, in a reasonably direct sense, the resulting harm." Harvard Legal Essays, page 435.

Professor Seavy justifies the doctrine and notes that it is expanding. He states:

"Harsh and unjust beliefs and rules have frequently been long-lived, and, as a loose generalization, a rule for which untenable reasons alone are urged or which is defended upon historical grounds (explaining its origin but furnishing no reason for its continuance) is likely to be unjust. On the other hand, it may be noted that basic concepts are the most difficult to express, and that lack of power of expression often leads to specious reasons for sound results. The fact that the supposed victims of the rule, the employing class, usually powerful and vocal in the protection of their interest, have not been militant in demanding a change, and that the rule is constantly expanding without meeting substantial opposition during a time of searching analysis and self-revelation, is some evidence that it does not greatly depart from the common feeling of justice which it is the primary function of the law to satisfy."

And while lacking accuracy, especially since the doctrine has been extended to take in liability for acts not expressly commanded or assented to, and even acts which the master might have forbidden but which are within the scope of the employment and in furtherance of it, "we have the old reason (largely now a maxim) 'qui facit per alium facit

per se.' " This, as said, seems rather more fictional than factual because while one may do by another that which he commands or requests to be done, he does not do it through another in a careless manner nor does he ordinarily, in the scope of his business and in proposed furtherance thereof, do acts which are detrimental to it. This is on a par with the reasons given that the act of the servant was for the benefit of the master, or for his purported benefit, or that the master cannot take the benefits without accepting the detriments, neither of which theories stand up under analysis.

Finally we come to more pragmatic reasons advanced and discussed in "Vicarious Liability and Administration of Risk" by Douglas, 1929, 38 Yale L. J. 584, and in Comments, same Journal, Vol. 39, Page 861, and touched on in Professor Seavey's article, supra, that public policy demands certainty of recovery by one negligently injured, which result is more likely to ensue when the one to which the ultimate motivation of the act may be traced is held liable, he taking the risk of obtaining contribution. Akin to this is the idea of "distributing" the risk or "shifting" it which can be easier done through the employer than through the servant by passing it on to the ultimate consumer, or by carrying insurance. And Professor Seavey, in the essay above mentioned, suggests that as good a justification as any for charging the master who is without fault is that it results in greater care in the selection of servants and makes for more careful supervision. He indicates that liability may be imposed not so much for the purpose of doing of justice between individuals as to further a social policy which imposes a liability for "falling below a standard which includes taking sufficient precautions to prevent harm to others" or at least creates a sanction for the effort to keep such standards. These theses shift the emphasis from the realm of justice between individuals to the realm of social law—a growing tendency.

But I suspect the controversy as to the justice of holding one vicariously liable for the torts of another will continue to rage, whatever may be here said. Baty in his "Vicarious Liability," joining Holmes, can see no justice in it, whilst Laski in "The Basis of Vicarious Liability", 26 Yale L. J. 105, vigorously defends it. So we must leave the subject at this point in order to take up our next topic, hoping that in the end we may demonstrate that the historical and conceptional treatments of this subject of respondeat superior necessarily borrowed from the researches of others, and to whose researches justice cannot here so hastily be done, will aid in the consideration of the matter we set out to explore.

II. Relationships to Which the Doctrine is Applicable and Exceptions Thereto, Including the so-called Exception of Independent Contractor.

The doctrine of respondeat superior was applied to the relationship of master and servant. Unquestionably the very essence of the relationship is a right on the part of one party to the contract—the master—to command the other as to the duties for which he is hired and of a duty on the other—the servant—to respond to such commands and directions. In this sense, the very essence of the relationship is control. But relationships have grown up in which servants have more or less discretion in the field of action in which they work for their masters. These relationships are ofttimes designated as principal and agent. They range from the circumscribed agent whose duties are prescribed and limited as to scope and manner of performance—a mere servant or employee—to the general agent who not only executes for the principal but has large powers of choice not only as to means but as to action. And among this latter class the distinction between servant and independent contractor is in many cases very fine and depends on refined facts, if not ultimately on the leanings of the judge who determines the matter. Holmes says: "I have now only to complete the proof that agency in the

narrower sense, the law familiar to the higher, and more important representatives employed in modern business, is simply a branch of the law of master and servant." And again: "To conclude this part of my discussion, I repeat from my book on the Common Law, that as late as Blackstone agents appear under the general head of servants; that the precedents for the law of agency are cases of master and servant when the converse is not the case; and the Blackstone's language on this point is express, 'there is yet a fourth species of *servants* [italics added], if they may be so-called, being rather in a superior, a ministerial capacity; such as *stewards, factors* and bailiffs; whom however the law considers servants *pro tempore* with regard to such of acts as affect their master's or employer's property.' " According to Holmes in the old days factors and attorneys were servants. See Year Book, 8th Ed., vol. IV, folio 11b, *Alford* v. *Eglisfold Dyer,* 230 b, p. 56. In Blackstone's day the law of independent contractorship had not been developed; it may have scarcely begun. He was thinking of factors and attorneys and house and shipbuilders being "employed" to accomplish a purpose for him who engaged him.

While in the field of contractual liability it was necessary to determine whether one was acting for himself or as the agent or servant of another in order to know whether the other might be impressed with the contractual responsibility, there seems no doubt that term "independent contractor" is a product of the law of torts.

The term "independent contractor" itself was not at first used. The real problem which confronted the judges was as to whether, under the circumstances of the case before them, it was fair to apply the doctrine of respondeat superior as that doctrine has grown up over the ages with exceptions to fit the growth of ethico-social ideas. The historical reaches of the respondeat superior doctrine are included in this opinion as a background for the purpose of revealing the growth of the doctrine of independent contractorship

as an effort to escape from applying the former doctrine to new situations where it might be unfair that it be applied. The problem in these situations then took the form of asking under a particular set of facts whether "C" who negligently caused the harm was the servant of "A", or was he acting for himself, or as the servant of "B." Thus in reality it was a problem of determining whether the person charged stood in the relationship of master or principal to the one who had done the harm in respect to the work or acts he was engaged in at the time the harm was done. When it was determined that the relationship did not exist as to the one charged, the doctrine of respondeat superior did not apply. But in certain cases the judges were very much puzzled as to whether "C" was not the servant of the man sought to be charged with the delict. The matter is first clearly presented in *Bush* v. *Steinman*, 1799, 1 Bos. & P. 404. There the owner contracted with a carpenter to repair his house. A lime burner furnished the carpenter with lime. The servant of the lime burner left in the road a pile of lime with which plaintiff collided. He sued the owner of the house.

"The court, despite 'great difficulty in stating with accuracy the grounds for liability,' held the house owner responsible, partly as a matter of convenience to the plaintiff and partly because he was 'the person from whom the whole authority was originally derived.' The idea of an independent contractor as an enterpreneur, conducting and controlling his own business, was apparently a concept with which the court was unfamiliar at the time." Comments 39 Yale Law Journal, 863.

Two minor decisions at Nisi Prius followed: *Sly* v. *Edgley*, 1806, 6 Esp. 6, *Matthews* v. *West London Water Works Co.*, 1813, 3 Compl. 403. "In 1826 the famous case of *Laugher* v. *Pointer* [5 B. & C. 547], completely changed the complexion of the law." "The owner of a carriage who hired horses and driver from a livery stable was there held not responsible for the negligent operation of the carriage by the driver." The judges of the King's Bench were equally divided where-

upon the case was argued before the twelve judges. They could not agree and the judgment was then delivered by four judges, Littledale and Abbott, C. J., being with the defendant and Holroyd and Bailey with the plaintiff, with the above result. It was left an unsettled question. Here for later purposes we should note the reasons given by the judges. They are well stated in the old North Carolina case of *Wiswall* v. *Brinson,* 1849, 10 Ired Law. 554, 32 N. C. 554, decided nearly a century ago, as follows: "Littledale held, that he was not, and argued, that the case fell under the exception to the general rule, because the defendant did not select the driver, *and because the plaintiff had his remedy against the job man, 'who carried on a separate, independent calling, recognized by comman usage.'* Holroyd and Bailey held, that the case fell under the general rule, that the defendant had made the selection; for, he allowed the job-man, as his agent, to select the driver, which was the same as if he had made the selection himself, and if the plaintiff had a remedy against the job-man, it was no reason why he should not also have a remedy against the defendant, for whom the work was done, and let him look to the job man. They assume, that, if the job man had been the driver, instead of the person sent by him, the case would have been clear for the plaintiff; for, then, there would have been no other person to sue, save the person whose fault caused the injury, and the defendant, for whose benefit the work was done, and insist, that his sending a driver, instead of himself, made no difference. Abbott concludes the argument, contending that the case was the same, as if the job man had also furnished the carriage, which would be the ordinary case of one, riding in a stage or hack. He insists, that the job man exercised a *separate calling* and was liable for the negligence of his servant, the driver; that he was as able to pay the damage and as easily found out as the hirer, and there was no reason, why the hirer should also be liable." (Italics added.)

The Bush case was distinguished in the Laugher case as concerned with injuries ensuing in connection with real property, a distinction around which the well-written prevailing and dissenting opinions in *Wiswall* v. *Brinson,* supra, somewhat turn. The distinction seems to have been forgotten in *Reedie* v. *London & N. W. Ry.,* 1849, 4 Ex. 244, but persists in certain cases where it is said the duty of the owner cannot be delegated. See Comments, 39 Yale L. J., this and other exceptions, 865 et seq. Next came the case of *Quarman* v. *Burnett,* 1840, 6 M. & W. 499, where the facts were similar to the Laugher case and the case of *Milligan* v. *Wedge,* 1840, 12 Adol. &. El. 737, above discussed. *Rapson* v. *Cubitt,* 1842, 9 M. & W. 710 and *Allen* v. *Hayward* [1845]. 7 Q. B. 960, solidified the holding of the Laugher case. The progress of the law with exceptions eating into the Laugher case is well stated in "Comments" 39 Yale L. J., 845 et seq., as follows:

"For a quarter of a century the insulation afforded by the Laugher case was apparently complete.

"Beginning with *Ellis* v. *Sheffield Gas Consumers' Co.* [2 E. & B. 767], in 1853, however, the English courts, seeming to sense that they had carried the employer's freedom from responsibility too far, beat a steady retreat. In the Ellis case the plaintiff stumbled over a pile of stones left in a foot way by employees of an independent contractor who had just finished filling up a trench dug for the purpose of laying gas pipes. The work was illegal in that it had been done without a permit. The court held the employer responsible on the ground that the primary cause of the accident was the illegal act for which he had contracted. In *Pickard* v. *Smith* [10 C. B., N. S., 470], where a coal dealer negligently left open a coal hole, the doctrine was first promulgated that the duty of the employer in such a situation to take precautions was one he could not avoid by entrusting to another. In *Gray* v. *Pullen* [5 Best & Smith 970], the employer was made responsible for a contractor's negligence in filling a drain, the theory being that the Act authorizing the defendant to break up the street provided that he must keep it in a safe condition. And finally, in *Bower* v. *Peate* [1876, 1 Q. B. 321], a case involving injury to the plaintiff's house from excavations by a contractor on an adjoining lot, the defendant's responsibility was placed upon the broad ground that 'if an employer orders work from which in the natural course of

things injurious consequences will flow unless means are taken to prevent them, he is bound to see the doing of that necessary to prevent the mischief and cannot relieve himself by employing another.' "

Refinements in the development of the doctrine, its course in America and exceptions thereto, may be followed in the "Comments" above referred to and quoted from and in a well written note to *Hardy* v. *Shedden Company,* 37 L. R. A. 33. The heading to this last mentioned note illustrates the form in which the real question often presents itself. "Which of Two or More Persons is the Master of Another Who is Conceded to be the Servant of One of Them?"

I have at least given sufficient treatment to this subdivision to serve the purposes of this thesis. We will later call attention to the real grounds on which the relationship of independent contractor was based, to wit: that he furnished his services from out of a special calling and hence was not considered a servant of the defendant because he was by reason of that special calling given control over that job. Knudsen was in this case not called for a definite job or piece of work as part of carrying on an independently established business but was in reality a necessary cog in the company's business. We pass on to the next subdivision.

III. Tests Developed and Applied in the Legal Climate of Tortious Responsibility to Determine Whether the Relationship of Master & Servant Existed.

We have noted that the industrial age broadened the responsibility for the wrongs of the servant done pursuant to a particular command, to one for wrongs done in scope of the employment while in pursuit of the master's business. While responsibility of the master was being expanded to cover a wider range of servant-done acts or ommissions, the responsibility always presupposed the existence of the relationship of master and servant. The growth of the independent contractor conception was not meant to affect the field of acts for which the master was liable but involved rather the matter of whether the master and servant rela-

tionship existed. So while the field of responsibility of the master was being widened in one direction it was being narrowed through conceptions affecting its very constitution in another. It was not long before the legal investigators attempted to evolve from the decisions a set of tests for the determination of the existence or non-existence of the master and servant relationship. The main one was "control" or "right of control." This is hardly an incident of the master and servant relationship; it is the essence. Mastership could hardly exist without command of the one over whom he was master, and servanthood could hardly be conceived of without amenability to the control of another. It is hardly an attribute of the relationship. It *is* the relationship. But two questions forged to the front: (1) At what point must the control be applied? To the detailed means or methods of carrying on the work or only at the point of the final objective, being practically limited to acceptance or rejection of the accomplishment of somewhere in between to cause it to fall on one side or the other of the line between master and servant and independent contractorship? (2) What evidences of "right of control" or the lack of it would suffice? It will be seen that the significance of this second question has not been appreciated. In certain cases it is difficult to know whether one has the right of control over another for the reason that such right, if it exists, has never been used. In fact, in many cases it would be quite impracticable for control to be exercised. A salesman comes and goes as he pleases, choosing his own routing and even his own territory, owning his car, paying his own expenses, and soliciting and developing customers of his own choosing in his own way without interference from his admitted employer from one year's end to the other. As long as he reasonably produces no questions are asked, yet no one questions that he is an employee—a servant. Why? Because the other characteristics of the relationship *give evidence* that there is reversionary control. That is perhaps their chief use. Many of the characteristics which it is said

attend the master and servant relationship are not so much characteristics of it as they are indicators of the right to control them which, or from the absence of which the relationship is deduced. These characteristics are, perhaps, linked up with the relationship in series in a sort of hierarchy rather than on one plane with right of control essential and predominating. But, perhaps this cannot be asserted dogmatically.

Says Professor Leidy at p. 365 of 28 Mich. L. R.:

"The most recent authoritative commendation of this test [control test] is found in the American Law Institute Restatement of the Law of Agency, where the independent contractor is described, and his characteristics defined in the following manner: 'An independent contractor is a person who undertakes to execute certain work or to accomplish a stipulated result for another, under such circumstances that the right of control of the doing of the work, and of the forces and agencies employed in doing it, is in the contractor.'"

But note also the characteristics and especially the comments in parenthesis which Professor Leidy quotes from the Restatement:

"'The characteristics of the independent contractor are that he is a person (usually carrying on a distinct occupation) who for a stipulated compensation (usually a lump sum) undertakes to do a piece of work (usually of some magnitude) by his own forces and instrumentalities (usually supplying labor and materials) being responsible to his employer for the stipulated results but (essential characteristic) being left in control of the operation of the forces and instrumentalities by which the stipulated result is to be accomplished.'"

Certainly where a contractor is to build a structure or some chattel according to order and specifications, being responsible for delivering the finished thing, even though subject to an architect's supervision, he approaches the vendor relationship. A builder who builds houses or boats and sells them is not so far removed from a contractor who builds on order, having in a sense a buyer for the thing

before it is made. It is in the field of services that we have our difficulties. Bush v. Steinman; Laugher v. Pointer; and Quarman v. Burnett, were all cases of employment of services. It is ventured that the tests or right of choice, right to discharge, type and manner of remunerating, manner in which accounts are kept, represent a cluster which throws light on the right to control where there is little or no evidence of any actual controlling. But where one in an independently established business is engaged to do a definite job or piece of work, the likelihood that he rather than the owner or employer is to control the manner and means of doing the work would be very strong, although nothing was said about control. Contrarywise, where one is engaged, like Knudsen, giving continuously of his time to the sale of one producer's articles, although at the same time handling a complementary article so that there is no definite job or piece of work to be done (unless, indeed, continuous work for an indefinite time until one or the other severs the employment is a definite job or piece of work which would seem to involve a contradiction), not holding himself out as open to competitive business, and having no place of business of his own, the likelihood is very strong that the owner, or employer has the right of control although nothing was said about it nor was it exercised and even though the defendant in a subsequent suit may have disclaimed control. The "distinct calling" feature, as Professor Leidy remarks, was given recognition in *O'Neill* v. *Blase,* 94 Mo. App. 648, 68 S. W. 764, and in *Mullich* v. *Brocker,* 119 Mo. App. 332, 97 S. W. 549, 551. In the first case the defendant "hired a lad to fetch the cow down." The court said [94 Mo. App. 648, 68 S. W. 767]:

" 'Nor is there anything whatever in the testimony to prove that Simon exercised a distinct calling. * * * The independence of the contractor may appear by the nature of the work sometimes, and at other times by the terms of the contract, or by the calling of the contractor. * * *' "

In the second case the court said:

" 'We think it apparent that the court below was in error in holding, as a conclusion of law, that Schoenborn was an independent contractor * * *. We find no countenance for the proposition that a person not especially qualified for a particular service, but ready to undertake any job which may be offered to him that he thinks himself able to perform, becomes, when hired for some job, an independent contractor, simply because the employer relinquishes control over the work and trusts to the employe's discretion. It looks like the employe must have a calling in which it is fair to assume that he had developed skill before he will be regarded otherwise than as a servant. We do not say he must have a trade or profession, be a skilled mechanic, doctor, or lawyer; but he must hold himself out as having an occupation with which he is familiar.' "

This was the basis of Laugher v. Pointer, and of Milligan v. Wedge as above pointed out; of Quarman v. Burnett and of the well reasoned early American case of *Wiswall* v. *Brinson*, supra, which was, however, also based on the doctrine that an owner cannot escape from the responsibility for a nuisance or from the injurious consequences which will flow in the *natural course* from work which he orders unless he takes steps to prevent it. In selecting cases, therefore, which hold that the defendant had no right of control because it resided in another who followed a special calling and was hence an independent contractor, it is necessary to exclude all those cases where the independent contractorship is *admitted* but the owner or employer is still held because of factual situations, which bring into being legal principles which do not permit him to exonerate himself from liability. Such is the case of *Bower* v. *Peate*, [1876], 1 Q. B. 321. *Pickard* v. *Smith*, 1861, 10 C. B., N. S., 470 and *Gray* v. *Pullen*, 1864, 5 Best & Smith 970, and others mentioned in the notes to "Comments" Yale L. J., supra, pages 864 et seq.

IV. Control.

Much of this division of the subject has already been intertwined in the other subdivisions. Right of control being

the very heart of the master and servant relationship, we find that evidence of its absence or existence are furnished by the subsidiary tests above mentioned, and that one very important circumstance leading to the conclusion that it is not present is when the employer engages a man who carries on a special or distinct calling, to do a definite job or piece of work within that calling. In such case, as was well said by Professor Douglas in his Articles on "Vicarious Liability," 38 Yale L. J., the employer "lops off the particular function" and "allocates it to another." Conversely when the person employed engages all his working time, as in the instant case, selling one man's goods or two non-competitive lines, working continuously, subject only to discharge on notice, having no place of business of his own, and doing work which constitutes a natural department or division of the industry or business in which he works—he is not an independent contractor but an employee, integrated in the business and carrying on a part of it.

A word should be said about the point where control is applied and what may constitute right of control. Professor Leidy, in the article mentioned in the fore part of this opinion, calls attention to the inconsistency between the holdings in those cases where one used a car to stimulate sales in a product other than an automobile, and in those cases where a salesman is an automobile demonstrator and a party is injured. In the first class the employer is liable for the negligence of the "drummer" if the act occurred while on the employer's business. In the second class of cases there is a split in the authorities. Whilst in those cases where an individual engages some "pickup" person to sell his used car, the cases generally hold such engaged persons to be an independent contractor. Professor Leidy suggests that the point at which the test of right of control should be applied is not in regard to the detailed acts in respect to which it would be impracticable to control in any case, as for the instance those of a truck driver on his rounds, but

the question should be: "Who controls the whole situation of which the demonstration is a part?"

In the instant case who controlled the *whole* situation in which salesman Knudsen played a part? Certainly the appellant. It could not control his detailed movements even if it so desired but by the right to discharge it had an indirect right of control. Even if a contract for continuous work of this nature had been entered into expressly denying the Stover Bedding Company the right to control Knudsen on his job, if he could be discharged without notice or on short notice from employment that was indefinite in its tenure and of a character which called for continuous service of the same nature rather than one for a definite piece of work, he would, I think, be thereby subject to control. I refer the reader to my opinion in the case of *Fuller Brush Company* v. *Industrial Comm.,* supra.

All that I have said above refers to the field of tortious liability. I have attempted to demonstrate that even in that field the law, when properly understood, does not treat a person in Knudsen's situation as an independent contractor.

V. Should the test of Employer and Employee be Stricter or More Liberal in the Matter of Workmen's Compensation than in the Field of Tortious Responsibility?

I have already expressed the opinion that by implication the definition of "employee" set out in 42-1-41 (2) R. S. Utah 1933, includes those who, while not under the control as to means and methods of accomplishing their work, are engaged in continuous service of indefinite tenure rather than on a "definite job or piece of work." But if this implication were not in the statute, I think the result should be the same. Certainly if in the field of torts the doctrine of respondeat superior should apply to one in Knudsen's position even though the testimony is that there was no right to control, it should certainly apply in the field of Workmen's Compensation. In the first place the general purposes of the Act argue for his inclusion. In the second place, he may be included on the payroll and the risk be

"shifted" and the costs distributed. Every argument which Mr. Douglas advances in support of the doctrine of respondeat superior and its legitimate extension on the basis of a "shifting" and distribution of risk in the field of Torts certainly applies with greater vigor in the field of Workmen's Compensation where the risk may be distributed with certainty. I can see no real reason for excluding a person in Knudsen's position.

To conclude: By the definition of "employee" as contained in the Workmen's Compensation Act itself, Knudsen was in the service of the Stover Bedding Company because he was not one "engaged in the performance of a definite job or piece of work" but was engaged continuously in the work of salesman of the products of that company, which work was itself of the sort which was actually a part of the industry. Moreover, in the field of tortious responsibility the doctrine of respondeat superior was an incident of the master and servant relationship with an ancestry running into antiquity. During early times when the scope of service was circumscribed to comparatively simple acts, all service relationships were those of master and servant. The master was required to respond regardless of the quality of the act of the servant which produced the injury and without regard to ethico-legal notion of fault or design. The conceptional development later separated harm deliberately done from that done unintentionally in the criminal and civil fields. As the idea of civil liability of the master was freed from the idea of penal liability, the harm caused by the act of the servant was required to be by the particular command (or assent) of the master. As industry presented complicated factual situations seeming to call for the master bearing the burden when the servant was acting within the scope of his business and in furtherance thereof and therefore, for his benefit, the doctrine of particular command expanded into the fiction of implying the particular commands from the general power or authority to carry on for the master the work incident to which the harm

occurred. There were presented factual situations in which there arose a question whether, for the purposes of the doctrine of respondeat superior, there existed the master and servant relationship. Out of these situations a service performed not by a servant but by an independent contractor was discovered and the question presented itself as to whether the defendant had not lopped off "the particular function in question * * * and allocated it to another." The test of this relationship, as distinguished from that of master and servant, was whether or not right of control as to means and manner of work to gain the result, was present. Where there was no direct evidence on whether such right of control existed, subsidiary facts were resorted to which were also termed as tests of what the relationship really was. The "right of control" test with its cluster of illuminating facts to ascertain its existence was developed in the legal climate of tortious responsibility. The courts in applying the right of control test failed sufficiently to take into consideration indirect control by power of discharge because they failed to appreciate that the independent contractorship did not extend to continuous work normally a part of the master's business but only to a definite job usually performed by one who exercised a special calling for such work and who could not be discharged without contractual liability before the work was finished, in the absence of any breach on his part. In other words, the question of whether one has lopped off a particular function of his business, usually a part of it, and made it a part of another's business may depend predominantly on whether such other is independently in the business of taking on such functions. the courts have somewhat blindly applied the control test without regard to the nature of the job being done and regardless of its ordinary relationship to the whole of the industry of which it is a natural part, and without regard to whether the contractor was called in for a definite job as part of the carrying on of *his* independently established business or whether he was really carrying on, until dis-

charge, a regular and organizational part of an employer's business. The task of the doctrine of respondeat superior was one of determining who among two or more should bear the burden of a harm and not one of social pooling or distribution of the risks of society as they appeared in industry. In the field of statutory obligations imposed for the social purpose of distributing risks without regard to the element of fault or wrong, the test of right of control for the determination of the employer-employee relationship (master and servant) should be applied at least as it should have been applied in the tort field. The central idea which I have attempted to develop may be stated rather simply. The doctrine of respondeat superior with a lineage reaching back into antiquity had thoroughly fastened itself on the relationship of master and servant. In more modern times the doctrine was still retained, even though no fault could be imputed to the master, on the broad ground that, where one was injured, he who set the cause in motion should also respond; otherwise the injured might remain unrecompensed. Especially as industry grew was this principle invoked in order to distribute the risk back through industry. But situations arose where the doctrine of respondeat superior, even on the basis of the contractor as a motivator or cause, seemed too remote. These were cases where the employer had delegated a definite job or piece of work to one who was independently set up in business to do such job. The very reliance on the fitness of the one in the special business or calling required that the employer relinquish control of means and method of accomplishment. The situations in which the question of whether the doctrine of respondeat superior should apply first took on the aspect of determining whose servant was the person who had committed the injury. If he was the servant of the "independent contractor"—a term later used—the employer of the independent contractor was not liable. The whole doctrine, therefore, of independent contractorship grew out of a desire to escape from the principle of respondeat superior

in certain situations and was evolved in the legal climate of tortious responsibility. But even in the field of tort the escape from the doctrine of respondeat superior was allowed only where the one who committed the injury was the servant of, or was himself the one, who carried on a special calling and was temporarily engaged by another to do a piece of work having definite limits. This "special calling" feature was the main factor in the test as to who had the right of control. Certainly, a fortiori where the purpose is socially to distribute the risk without regard to fault and without regard to the tort principle of respondeat superior, the tests of determination of the relationship of employer and employee which are the relationships to which such social principle applies, should not be any stricter but rather broader than in the tort field in order to subserve the social purposes of the Act. From this reasoning it is plain that Knudsen was not an independent contractor. He was not holding himself out as engaged in a special calling —but was continuously engaged in selling for the plaintiff, together with a complementary line of another. His duties placed him within the area of employer-employee relationships and not those of independent contractorship, especially since he was subject to discharge at any time even though the employer testified that he retained no right of control over him and such was the only evidence. The main factor entering into the test should be whether the alleged employee was doing a definite job or piece of work, a job which contemplated a definite time limit and/or a specific completion. If he was doing it as part of the carrying on of his independently established business it would be additional and fairly conclusive evidence that it was a definite piece of work lopped off from the business of his employer; otherwise, the conclusion would ordinarily be that he was an employee within the meaning of the Compensation Act. All of this leads to the final conclusion that Knudsen is an employee within the meaning of 42-1-41.