INTERMOUNTAIN SPEEDWAYS, Inc., et al. v.
INDUSTRIAL COMMISSION et al.

No. 6449.   Decided July 20, 1942.   (127 P. 2d 1045.)

See 71 C. J. Workmen's Compensation Acts, sec. 169; 28 R. C. L.,
761.

*F. A. Trottier*, of Salt Lake City, for plaintiffs.

*Grover A. Giles*, Atty. Gen., and *Zar E. Hayes*, Deputy
Atty. Gen., for defendants.

WOLFE, Justice.

Certiorari to the Industrial Commission to review an
award granting compensation to applicant, widow of Clyde

Goss, killed from injuries received while engaged in driving in the Midget Auto races.

This case is governed by the principles laid down in the case of *Intermountain Speedways, Inc., et al.* v. *Industrial Commission of Utah and Charles Winters, Deceased*, 101 Utah 573, 126 P. 2d 22. The facts differ in some immaterial respects from the facts in that case, but the question of whether Clyde Goss was an employee of the Intermountain Speedways, Inc., is the vital question in this case as it was in that case. The evidence as to the type of control exercised by Speedways is clearer cut in this case than in the Winters case. The witnesses for Speedways make it plain that there were regulations covering the type, build and specifications of cars which might compete; that it retained authority by use of flags to control the traffic on the track in interests of safety, even to the point of ruling off racing cars; that in interests of safety it would, through a committee, determine whether the contestant had the ability to drive. The nature and extent of the supervision is quite well disclosed by the following questions and answers:

"As I understand you then in your definition, it is largely a matter of regulating the traffic on the track so as to protect the rights of the various drivers and also to have them drive in as safe a manner as possible, is that what you mean? A. Yes."

"Q. It is practically the same as a traffic policeman out on the corner of one of the intersections directing traffic so they don't pile up on each other and so the rights of each driver is protected in safety. A. That is about it."

"Q. * * * as to actually telling a man how to drive a car in an individual race, you don't tell him that other than he must conform to these general standards and specifications. A. That is correct."

In answer to questions by the applicant's attorney this same witness answered as follows:

"Q. Would you say there is any control you can't exercise when a driver was on the track? A. Everything but that which causes accidents. We can't sit there and hold them by the hand, you know, they get too hot."

"Q. Is there anything that a man could do on that track that you could not control him? A. A Lot of things."

"Q. I know you could not sit by them. A. You mean something that causes an accident?"

"Q. You can tell him to do or not to do. Is there anything that would not be under your direction and supervision and control? A. I think not."

"Q. You could prevent him from smoking while driving? A. Yes."

"Q. And prevent him from drinking? A. Oh, yes."

"Q. And prevent him from eating a sandwich? A. You could not prevent him from actually doing it but you could stop him the next time he came around."

"Q. I mean forbid? A. Yes."

"Q. That is what we mean by control. You can tell him he can or can't do certain things? A. Yes."

"Q. I am trying to think of something a man could tell you to go to hell and still stay on the track? A. I don't think there is anything he can." (T. 30 and 31.)

When all the evidence—at first, seemingly inconsistent— is analyzed it boils down to what has been stated above— that the company had the right of supervision and control in those matters pertaining to safety. It exercised no control as to the method, means of judgment of operating the car except in so far as the movements affected the safety of all contestants. Such supervision and control are not inconsistent with a non-master-servant relationship. It is difficult to conceive of a contest where a number of rules and regulations might not be required in order to control and supervise the contestants to the extent necessary for orderly and safe competition. The more hazardous the competition the greater the need for such rules. The fact that a nominal fee—no more than would take care of ordinary expenses was paid to the contestants, or their expenses paid to the place of competition, would not alter the relationship. If we were to hold otherwise we might open the door to making every radio contestant who at all events receives some consolation money, an employee of the sponsor of the program.

Defendant Goss contends that under the tests as laid down in *Stover Bedding Company* v. *Industrial Commission*, 99 Utah 423, 107 P. 2d 1027, 134 A. L. R. 1006, deceased in this case was an employee. But even under the views of the dissenting opinion in the Stover case, decedent in this case was not an employee.

In this case it is true that the nature of the driver's task was such as to make control of means and methods of operation of a car difficult, if not impossible, just as in the Stover case such control over the salesman on his route would have been impracticable. But in this case as in the Winter's case there was an offer made to every contestant to pay $2.50 for every race he entered. This could not, under the circumstances of this case, be construed as a contract of hire, express or implied. Goss was not "hired" to run the race but paid $2.50 for entering a contest. If he physically entered the race he was entitled to the $2.50, regardless of whether he finished. A "hired" man is given certain work to perform and is paid for the work. In this case the reward for effort was not a wage paid under a contract of hire but depended on whether his skill, luck and efforts brought him within the prize money. It is unnecessary to determine whether the relationship of Goss to Speedways was that of an independent contractor or merely as a contestant induced by the hope of winning and the payment of $2.50 for each race entered. It suffices to know that he was not an employee as defined by the Workmen's Compensation Act, Rev. St. 1933, 42-1-1 et seq.

Award annulled.

McDONOUGH, J., and BRYAN P. LEVERICH, District Judge, concur.

MOFFAT, Chief Justice.

I dissent.

The Intermountain Speedways, Inc., was engaged in the operation of a business for profit, and entertainment of the

public. The drivers of the midget cars and the cars formed the basis of both the entertainment and profit. They were as much an integral part of the business as the management and track upon which the races were run. True, one of the inducements to the drivers was a prospective prize; but they were required to pay $2.50 to participate in the business which they did not own or control; but were subject to detailed control.

While the case is similar to the case of *Intermountain Speedways* v. *Industrial Commission and Winters,* 101 Utah 573, 126 P. 2d 22, recently decided, I think the facts are sufficient to warrant the award of the commission.

LARSON, Justice.

I concur in the views expressed by Mr. Chief Justice MOFFAT in his dissenting opinion.

PRATT, J., on leave of absence.